FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2002 OCT 11  PM 4: 13

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KONINKLIJKE NUMICO N.V. and
NUTRICIA USA, INC., as successor to
NUTRICIA UTAH, L.P.,

        Plaintiffs,

      v.

KEB ENTERPRISES, L.P., MADELEINE
L.L.C., G³ HOLDING 1, L.C.,
NUTRITIONAL SUPPLEMENT
INVESTORS, L.L.C., VLE IX, LTD.,
WINDRIVER CAPITAL LIMITED/ICGL,
DAB INVESTMENTS, L.P.,
GLENN J. BOSCHETTO, KENNETH and
LINDA BRAILSFORD, S. PETER EHRICH,
BLAKE H. LARSEN,
CALVIN W. MCCAUSLAND,
ANDREY SHORIN, and KURT B. LARSEN,

        Defendants.

Civil Action No.

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiffs, Koninklijke Numico N.V. ("Royal Numico") and Nutricia USA, Inc. ("Nutricia USA"), as successor to Nutricia Utah, L.P. ("Nutricia Utah") (collectively, "Numico"), for their Complaint against Defendants, KEB Enterprises, L.P. ("KEB Enterprises"); Madeleine L.L.C. ("Madeleine"); G³ Holding 1, L.C. ("G³ Holding"); Nutritional Supplement Investors, L.L.C. ("NSI"); VLE IX, Ltd. ("VLE IX"); Windriver Capital Limited/ICGL ("Windriver"); DAB Investments, L.P. ("DAB Investments"); Glenn J. Boschetto; Kenneth and Linda Brailsford;  S. Peter Ehrich;  Blake H. Larsen;  Calvin W. McCausland;  Andrey Shorin (collectively, the "Former Enrich Shareholders"), and Kurt B. Larsen, state:

## NATURE OF THE ACTION

1.      In this suit, Numico seeks indemnification from the Former Enrich Shareholders pursuant to the Indemnification Agreement entered on or about February 29, 2000 (the "Indemnification Agreement"). Numico's indemnity claim arises out of the breaches of certain representations and warranties made in connection with Numico's acquisition of Enrich International, Inc. ("Enrich"). The Former Enrich Shareholders received in excess of $50 million in exchange for their Enrich shares. An additional $6.5 million was paid by Numico into an indemnity escrow account in connection with the acquisition. The Former Enrich Shareholders jointly and severally agreed to indemnify Numico against all losses Numico sustained as a result of the breaches of the representations and warranties made in connection with Numico's acquisition of Enrich. Glenn J. Boschetto, Kenneth Brailsford and Kurt B. Larsen guaranteed certain of the Former Enrich Shareholders' obligations to indemnify Numico pursuant to certain Agreements of Guaranty, dated as of February 29, 2000 (the "Guaranty Agreements"). As a result of the numerous breaches of the representations and warranties described herein, Numico sustained losses in excess of $14.5 million. Despite Numico's repeated requests, Defendants have refused to indemnify Numico, despite their obligation to do so under the Indemnification Agreement and the Agreements of Guaranty.

## THE PARTIES

2.      Royal Numico is a company organized and existing under the laws of The Netherlands with its principal executive office located in Zoetermeer, The Netherlands. Royal Numico is involved in, among other things, the development, manufacture and sale of infant nutrition products, nutritional supplements and other nutritional products.

3.      Nutricia Utah was a Delaware limited partnership that consisted of Nutricia Delaware, Inc., a Delaware corporation with its principal office in Wilmington, Delaware, and

Nutricia International, B.V., a company organized and existing under the laws of The Netherlands with its principal executive office located in Zoetermeer, The Netherlands. Nutricia Utah was an indirect wholly owned subsidiary of Royal Numico. On March 26, 2001, Nutricia Utah merged into Nutricia USA, a Delaware corporation with its principal place of business located in Pittsburgh, Pennsylvania. Nutricia USA is the successor to the interests of and possesses all of the rights, privileges and powers of Nutricia Utah, including those relating to and arising under the Indemnification Agreement and Guaranty Agreements.

4. KEB Enterprises is a Utah limited partnership consisting of Kenneth Brailsford and Linda Brailsford. KEB Enterprises' principal place of business is located at 282 West River Bend Road, Suite 350, Provo, Utah 84604. KEB Enterprises is a former shareholder of Enrich. In exchange for the sale of its 210,000 shares of Enrich Series "A" 8% Redeemable Exchangeable Cumulative Non-Voting Preferred Stock and 2,790,000 shares of Enrich Common Stock, KEB Enterprises received an Initial Per Share Cash Payment totaling $32,858,632.

5. Madeleine is a New York limited liability corporation with its principal place of business at 450 Park Avenue, New York, New York 10022. Madeleine is a former shareholder of Enrich. In exchange for the sale of its 2,500 shares of Enrich Series "C" 8% Redeemable Exchangeable Cumulative Non-Voting Preferred Stock ("Enrich Series C stock"), 4,167 shares of Enrich Series "D" 8% Redeemable Exchangeable Cumulative Non-Voting Preferred Stock ("Enrich Series D stock") and 2,633,333 shares of Enrich Common Stock, Madeleine received an Initial Per Share Cash Payment totaling $6,729,392.

6. $G^3$ Holding is a Utah limited liability corporation with its principal place of business at 175 S. West Temple, Suite 710, Salt Lake City, Utah 84147. $G^3$ Holding is a former

shareholder of Enrich.  In exchange for the sale of its 1,875 shares of Enrich Series C stock, 3,125 shares of Enrich Series D stock and 849,970 shares of Enrich Common Stock, G³ Holding received an Initial Per Share Cash Payment totaling $2,533,156.

7.      NSI is a Utah limited liability corporation with its principal place of business at 185 S. State Street, Suite 1300, Salt Lake City, Utah  84111.  NSI is a former shareholder of Enrich.  In exchange for the sale of its 827 shares of Enrich Series C stock, 1,378 shares of Enrich Series D stock and 374,907 shares of Enrich common stock, NSI received an Initial Per Share Cash Payment totaling $1,117,279.

8.      VLE IX is a Utah limited partnership consisting of Vaughan R. Erickson and Linda H. Erickson who reside at 35 N 1480 E, Springville, Utah  84663.  VLE IX's principal place of business is located at 35 N 1480 E, Springville, Utah  84663.  VLE IX is a former shareholder of Enrich.  In exchange for the sale of its 404,580 shares of Enrich Common stock, VLE IX received an Initial Per Share Cash Payment totaling $904,026.

9.      Windriver is a Utah limited liability company with its principal place of business at 6322 S 3000 E, Suite 340, Salt Lake City, Utah  84121.  Windriver is a former shareholder of Enrich.  In exchange for the sale of its 938 shares of Enrich Series C stock, 937 shares of Enrich Series D stock and 254,991 shares of Enrich Common Stock, Windriver received an Initial Per Share Cash Payment totaling $807,490.

10.     DAB Investments is a Utah limited partnership consisting of David T. Lisonbee and Bianca P. Lisonbee who reside at 748 N 1340 W, Orem, Utah  84057.  DAB Investments' principal place of business is located at 748 N 1340 W, Orem, Utah  84057.  DAB Investments is a former shareholder of Enrich.  In exchange for the sale of its 204,907 shares of Enrich

Common Stock, DAB Investments received an Initial Per Share Cash Payment totaling $457,861.

11.     Glenn J. Boschetto is an individual who resides at 1031 Douglas Street, Salt Lake City, Utah 84105. He is a former shareholder of Enrich. In exchange for the sale of his 937 shares of Enrich Series C stock, 2,188 shares of Enrich Series D stock and 594,979 shares of Enrich Common Stock, Mr. Boschetto received an Initial Per Share Cash Payment totaling $1,725,665. Mr. Boschetto also is an equity holder of Windriver.

12.     Kenneth and Linda Brailsford are individuals who reside at 748 N 1340 W, Orem, Utah 84057. They are former shareholders of Enrich. In exchange for the sale of their 200,000 shares of Enrich Common Stock, Mr. and Mrs. Brailsford received an Initial Per Share Cash Payment totaling $446,896. Mr. Brailsford is a partner of KEB Enterprises.

13.     S. Peter Ehrich is an individual who resides at 5110 Cove Canyon Drive, Park City, Utah 84060. He is a former shareholder of Enrich. In exchange for the sale of his 264 shares of Enrich Series C stock, 441 shares of Enrich Series D stock and 321,387 shares of Enrich Common Stock, Mr. Ehrich received an Initial Per Share Cash Payment totaling $807,515.

14.     Blake H. Larsen is an individual who resides at 12040 North Friar Drive, Hayden Lake, Idaho 83835. He is a former shareholder of Enrich. In exchange for the sale of his 348,000 shares of Enrich Common Stock, Blake H. Larsen received an Initial Per Share Cash Payment totaling $777,599.

15.     Calvin W. McCausland is an individual who resides at 270 W 200 S, Springville, Utah 84663. He is a former shareholder of Enrich. In exchange for the sale of his 187,644

shares of Enrich Common Stock, Mr. McCausland received an Initial Per Share Cash Payment totaling $419,287.

16.    Andrey Shorin is an individual who resides at 463 E 1450 N, Orem, Utah 84097. He is a former shareholder of and Vice President of Marketing and Communications for Enrich. In exchange for the sale of his 250,000 shares of Enrich Common Stock, Mr. Shorin received an Initial Per Share Cash Payment totaling $558,620.

17.    Kurt B. Larsen is an individual who resides at 136 Heber Avenue, Park City, Utah 84098. Kurt B. Larsen was designated as the Shareholders' Representative by the Former Enrich Shareholders pursuant to Section 6(a) of the Indemnification Agreement and Section 1.12 of the Agreement and Plan of Merger, dated as of February 17, 2000 (the "Merger Agreement"). Kurt B. Larsen is a member of NSI. Kurt B. Larsen is an equity holder of $G^3$ Holding.

### JURISDICTION AND VENUE

18.    The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a), as the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

19.    Venue is proper in this District because, pursuant to Section 6(p) of the Indemnification Agreement, the Former Enrich Shareholders agreed to submit themselves to the jurisdiction of the federal district court sitting in Wilmington, Delaware, and agreed that any action arising out of or relating to the Indemnification Agreement would be heard and determined by the federal district court sitting in Wilmington, Delaware.

20.    Pursuant to Section 6(p) of the Indemnification Agreement, the Former Enrich Shareholders waived any defense of inconvenient forum to the maintenance of any such action or proceeding brought in the federal district court sitting in Wilmington, Delaware.

21.    Venue is proper in this district because, pursuant to Section 14 of Agreements of Guaranty, Glenn J. Boschetto, Kenneth Brailsford and Kurt B. Larsen agreed to submit themselves to the jurisdiction and venue of the federal district court sitting in Wilmington, Delaware in any suit, action or proceeding arising out of or related to the Agreements of Guaranty.

## FACTUAL BACKGROUND AND STATEMENT OF CASE

### THE INDEMNIFICATION AGREEMENT

22.    On or about February 17, 2000, Nutricia Utah, Nutricia Utah Corp., a Utah corporation and wholly owned subsidiary of Nutricia Utah, and Enrich entered into the Merger Agreement for acquisition of Enrich.

23.    On or about February 29, 2000, Nutricia Utah and certain individuals and entities, including the Former Enrich Shareholders and the Shareholders' Representative, entered into the Indemnification Agreement.

24.    The Indemnification Agreement provides for, among other things, the post-closing indemnification by the Former Enrich Shareholders to Numico for any breaches of the representations and warranties made by Enrich in the Merger Agreement and for certain other indemnities, described more fully below.

25.    Section 1.4(b)(i) of the Indemnification Agreement provides that, in the event Enrich breaches its representations and warranties contained in the Merger Agreement, including those described herein, then the Former Enrich Shareholders agree to jointly and severally indemnify Numico from any Losses (as defined in the Indemnification Agreement) that Numico may suffer resulting from, arising out of, related to, or caused by any such breach.

26.    Section 1.4(b)(i) of the Indemnification Agreement further states that, "[f]or the purposes of determining whether Enrich has breached any representations [or] warranty . . .

contained in the Merger Agreement and for indemnification hereunder, all references to 'Material' . . . and the like shall be disregarded."

27.    Pursuant to Section 4(b)(ii)(A) of the Indemnification Agreement, the Former Enrich Shareholders agreed to jointly and severally indemnify Numico from any Losses resulting from, arising out of, relating to, or caused by certain claims made by any Enrich Dissenting Shareholder, as defined by the Indemnification Agreement, plus all out-of-pocket costs, fees and expenses reasonably incurred by Numico and Enrich in administrating and handling the claims of such Enrich Dissenting Shareholders (the "Enrich Dissenting Shareholders Matters").

28.    Pursuant to Section 4(b)(ii)(D), the Former Enrich Shareholders agreed to jointly and severally indemnify Numico from any Losses resulting from, arising out of, relating to, or caused by the ownership of certain equity interests in Enrich by Sergey Bulavchenko, plus all out-of-pocket costs, fees and expenses, including attorneys' fees, reasonably incurred by Numico and Enrich in connection with the redemption, repurchase or other cancellation of such shares or any litigation related to any such matters (the "Bulavchenko Matters").

29.    The term "Losses" was defined by the Indemnification Agreement to mean:

> [A]ll damages . . . penalties, fines, costs, amounts paid in settlement, liabilities (whether liquidated or accrued), obligations, Taxes, . . ., losses, expenses, and fees, including court costs and reasonable attorneys' fees and expenses including, but not limited to, those arising from or related to actions, suits, proceedings, hearings, investigations, charges, complaints, claims demands, . . . incurred in connection with the enforcement of this [Indemnification] Agreement.

30.    Section 4(b)(i) of the Indemnification Agreement further provides that the Former Enrich Shareholders are not obligated to indemnify Numico for any Losses resulting from, arising out of, related to, or caused by the breach of any representation or warranty of Enrich, other than the representations and warranties made pursuant to Section 3.8 of the Merger

Agreement, until Numico has suffered, in the aggregate, Losses by reason of all such breaches in excess of $1 million (the "$1 Million Threshold"), at which point the Former Enrich Shareholders are obligated to jointly and severally indemnify Numico for all such losses in excess of the $1 Million Threshold up to their respective Allocable Portion of Holdback and Allocable Portion of Remainder (as those terms are defined in the Indemnification Agreement).

31.     Section 4(b)(iii) of the Indemnification Agreement states that Numico would be reimbursed for the first $6.5 million in Losses relating to the matters described in Section 4(b)(i) (in excess of the $1 Million Threshold) and Section 4(b)(ii) of the Indemnification Agreement from the Indemnity Escrow Account.

32.     Section 4(b)(iii) of the Indemnification Agreement further states that, in the event that Numico fails to be fully reimbursed from the Indemnity Escrow Account for its Losses, Numico can proceed to collect any such amounts from the Former Enrich Shareholders.

33.     Numico has performed all of its obligations under the Indemnification Agreement.

34.     All conditions precedent to the Former Enrich Shareholders' performance of their obligations under the Indemnification Agreement have been performed or have occurred.

## THE MERGER AGREEMENT AND CLOSING

35.     In the Merger Agreement, Enrich made certain representations and warranties that survived the closing of the Enrich acquisition regarding, among other things, the financial statements, taxes and tax returns of Enrich and its subsidiaries.   Those representations and warranties are set forth in Article III of the Merger Agreement and are summarized in relevant part below.

36.     In Section 3.5 of the Merger Agreement, Enrich represented and warranted as true and correct that Enrich's Financial Statements, including the Enrich Consolidated Balance Sheet,

dated March 31, 1999 (the "March 1999 Balance Sheet") and the Enrich Consolidated Balance

Sheet as of December 31, 1999 (the "December 1999 Balance Sheet"), "have been prepared in

conformity with [United States generally accepted accounting principles ("GAAP")] applied on a

consistent basis . . ., and the statements of income present fairly . . . the results of operations of

Enrich and the Subsidiaries for the respective periods covered and the balance sheets present

fairly . . . the consolidated financial condition of Enrich and the Subsidiaries as of their

respective dates . . . ."

37.     In Section 3.5 of the Merger Agreement, Enrich further represented and warranted

as true and correct that, "[a]s of the dates of the Financial Statements, there were no contingent

liabilities of Enrich or the Subsidiaries which, in accordance with GAAP applied on a consistent

basis, should have been shown or reflected in such balance sheets or notes thereto, but which are

not so shown or reflected. . . ."

38.     In Section 3.8 of the Merger Agreement, Enrich represented and warranted as true

and correct that:

> Enrich and each of the Subsidiaries . . . has (i) duly filed all
> [federal, state, county and foreign tax returns ("Returns")] in a
> timely manner . . . consistent with applicable laws, as required to
> be filed by it (all such Returns being accurate and complete . . .)
> and has paid all Taxes shown thereon to be due, and (ii) duly paid
> all Taxes required to be paid by any of them through the date
> hereof, whether or not shown on a Return, other than Taxes that
> are being contested in good faith and by appropriate proceedings
> and as to which Enrich and the Subsidiaries either singly or in the
> aggregate has set aside on its books adequate reserves in
> accordance with GAAP (and which are set forth in Part 3.8(a) of
> the Disclosure Schedule).

39.     In Section 3.8 of the Merger Agreement, Enrich further represented and warranted

as true and correct that:

> All Taxes attributable to all taxable periods ended on or before the
> Closing Date, to the extent not required to have been previously

paid[,] will be fully and adequately reserved for on Enrich's financial statements in accordance with GAAP.

40.   In Section 3.8 of the Merger Agreement, Enrich further represented and warranted as true and correct that:

> The amounts recorded as reserves on the 1999 Audited Balance Sheet are sufficient in the aggregate for the payment by Enrich of all unpaid Taxes (including any interest or penalties thereon) whether or not disputed or accrued, for all periods ended on or prior to the date of such statement.

41.   In Section 3.8 of the Merger Agreement, Enrich also represented and warranted as true and correct that, except as set forth in the 1999 Audited Balance Sheet or on Part 3.8(a)(ii) of the Disclosure Schedule delivered by Enrich to Numico, "there are no deficiencies or claims asserted for Taxes against Enrich or any of its Subsidiaries."

42.   The Merger Agreement defines "Taxes" as:

> all federal, state, county, local, foreign and other taxes of any kind whatsoever (including, without limitation, income, profits, premium, estimated, excise, sales, use, occupancy, license, gross receipt, franchise, ad valorem, severance, capital levy, production, transfer, payroll, stamp, occupation, withholding, employment, unemployment, disability, social security, real property, personal property, transfer import duties and other governmental charges and assessments), whether or not measured in whole or in part by net income, and including deficiencies, interest, additions to tax and penalties with respect thereto, whether disputed or not . . . .

43.   On February 29, 2000, the closing of the acquisition of Enrich by Nutricia Utah took place (the "Closing").

44.   Pursuant to Section 8.2 of the Merger Agreement, the representations and warranties of Enrich contained in the Merger Agreement survived the Closing.

45.   Following the Closing, in exchange for their Enrich shares, the Former Enrich Shareholders received Initial Per Share Cash Payments, as defined in the Merger Agreement, in the amounts described above.

46.     Pursuant to Sections 1.3(a)(xi), 1.4 and 8.1 of the Merger Agreement, an Indemnity Escrow Amount of $6.5 million was deposited in an Indemnity Escrow Account, to reimburse Numico for any indemnification claims that Numico asserted against, among others, the Former Enrich Shareholders, pursuant to the Indemnification Agreement.

## NUMICO'S CLAIM NOTICE FOR INDEMNIFICATION

47.     As a result of the breaches of Enrich's representations and warranties set forth in the Merger Agreement and the other matters for which indemnification is owed by the Former Enrich Shareholders to Numico under the Indemnification Agreement, Numico has sustained Losses in excess of $14.5 million and Numico has incurred and will continue to incur reasonable attorneys' fees and costs herein to enforce its rights under the Indemnification Agreement.

48.     Pursuant to Section 4(e) of the Indemnification Agreement, on December 20, 2001, Numico sent the Former Enrich Shareholders and the Shareholders' Representative, Kurt B. Larsen, a Claim Notice (the "Claim Notice") demanding indemnification for the Losses sustained by Numico.

49.     Thereafter, pursuant to Section 4(e) of the Indemnification Agreement, Numico engaged in discussions and provided documents and other information to the Former Enrich Shareholders and the Shareholders' Representative with respect to Numico's demand for indemnification and the Claim Notice.

50.     Based upon those discussions and exchange of documents and information, on April 26, 2002, Numico sent to the Former Enrich Shareholders and the Shareholders' Representative a Supplemental Claim Notice ("Supplemental Claim Notice"), pursuant to Section 4(e) of the Indemnification Agreement.

51.     The Supplemental Claim Notice requested further additional information and documents, and demanded indemnification from the Former Enrich Shareholders for the Losses sustained by Numico.

52.     Pursuant to Section 4(e) of the Indemnification Agreement, Numico continued to engage in discussions and exchanged documents and other information with the Former Enrich Shareholders and the Shareholders' Representative with respect to Numico's demand for indemnification under the Indemnification Agreement, the Claim Notice and the Supplemental Claim Notice.

53.     Pursuant to Section 4(e) of the Indemnification Agreement, Numico acted in good faith in presenting its demand for indemnification, the Claim Notice and the Supplemental Claim Notice as well as pursuing its claim for indemnification, and attempted in good faith to resolve the dispute.

54.     The Former Enrich Shareholders have wrongfully refused and continue to refuse to indemnify Numico for the Losses sustained by Numico as required by the Indemnification Agreement.

55.     The Former Enrich Shareholders have wrongfully refused and continue to refuse to indemnify Numico for other matters for which indemnification is owned by the Former Enrich Shareholders to Numico under the Indemnification Agreement.

56.     Effective April 25, 2000, Numico and the Former Enrich Shareholders entered into a Tolling Agreement that tolled any and all time periods with respect to the claims asserted by Numico herein for purposes of: (a) any statute of limitations; (b) any period(s) of time or survival period(s) for filing an action or lawsuit for indemnification under Section 4 of the Indemnification Agreement; (c) laches; or (d) any other defense based upon the lapse of time in

any action or proceeding between Numico and the Former Enrich Shareholders.  The Tolling Agreement was terminated effective October 10, 2002.

### COUNT I

**CLAIM FOR INDEMNIFICATION RELATING TO BREACH OF REPRESENTATIONS AND WARRANTIES RELATING TO FINANCIAL STATEMENTS AGAINST THE FORMER ENRICH SHAREHOLDERS**

57.     Numico repeats, realleges and incorporates by reference, as if fully set forth herein, the allegations set forth in Paragraphs 1-56, above.

**OVERSTATED INVENTORY ASSETS AND UNDERSTATED INVENTORY RESERVE**

58.     Enrich's Financial Statements, including the December 31, 1999 Balance Sheet, overstated Enrich's inventory by $1,216,985, as described in Paragraphs 59-66 below.

59.     A portion of the inventory of Enrich's foreign operations could not be used and/or sold because the inventory had expired and/or had become obsolete.

60.     Under GAAP applied on a consistent basis, a reserve in the amount of $478,583 for expired and/or obsolete inventory should have been reflected in Enrich's Financial Statements, including the December 1999 Balance Sheet.

61.     However, no such reserve for expired and/or obsolete inventory for Enrich's foreign operations was reflected in Enrich's Financial Statements, including the December 1999 Balance Sheet.

62.     In calculating the inventory assets for Enrich's Eurasian operations as reflected in Enrich's Financial Statements, including the December 1999 Balance Sheet, Enrich included two general ledger accounts entitled "Inventory Freight/Misc." in the amount of $121,318.27 and "Inventory Manual Entry" in the amount of $109,029.39.

CHICAGO/#914511.7 10/7/02

63.   Under GAAP applied on a consistent basis, those two general ledger accounts, totaling $230,347.66, should not have been included in the calculation of the inventory for Enrich's Eurasian operations.

64.   In calculating the inventory assets for Enrich's Japanese subsidiary as reflected in Enrich's Financial Statements, including the December 1999 Balance Sheet, Enrich included two manual-entry general ledger accounts entitled "Inventory Freight/Misc." in the amount of $488,390 and "Inventory Customs" in the amount of $316,725. Those two accounts were used to capitalize the freight and customs charges related to Enrich's Japanese subsidiary's inventory as of December 31, 1999.

65.   Under GAAP applied on a consistent basis, those two manual-entry general ledger accounts overstated the costs of freight and customs related to the Japanese subsidiary's inventory by $308,054 as of December 31, 1999.

66.   In calculating its inventory assets for Enrich's Pharmatec subsidiary as reflected in Enrich's Financial Statements, including the December 1999 Balance Sheet, Enrich included a manual-entry general ledger account in an amount of $200,000 for "Adj. To Inv & OH Earned." Under GAAP applied upon a consistent basis, this manual-entry general ledger account in the amount of $200,000 should not have been included in the calculation of the inventory assets of Enrich's Pharmatec subsidiary as of December 31, 1999.

67.   Enrich's Financial Statements, including the December 1999 Balance Sheet, overstated Enrich's inventory assets and understated the amount of Enrich's inventory reserve by $1,216,985.

68.   Accordingly, Enrich's Financial Statements, including the December 1999 Balance Sheet, were not prepared in conformity with GAAP applied on a consistent basis and/or

- 15 -

did not present fairly the results of operations of Enrich and its Subsidiaries, and/or did not present fairly the consolidated financial condition of Enrich and its Subsidiaries, and each such failure breached the representations and warranties contained in Section 3.5 of the Merger Agreement.

## OVERSTATED ASSETS AND UNDERSTATED RESERVE RELATING TO THE GLOBAL MARKETING, L.L.C. PROMISSORY NOTE

69.    Enrich paid $1 million to Global Marketing, L.L.C., a Nevada limited liability company ("Global Marketing").

70.    Thereafter, Enrich and Global Marketing documented that transaction by executing a purported Demand Promissory Note (the "Global Marketing Promissory Note").

71.    The Global Marking Promissory Note provided by Enrich to Numico prior to the Closing is dated April 16, 1998.

72.    Upon information and belief, Global Marketing had no intention of repaying the $1 million to Enrich, and prior to the Closing, Enrich was advised by Global Marketing that Global Marketing would not repay the $1 million.

73.    Despite its knowledge that Global Marketing would not repay the $1 million to Enrich, Enrich's Financial Statements, including the December 1999 Balance Sheet, reflected the $1 million Global Marketing Promissory Note as an asset of Enrich.

74.    Following the Closing, Numico repeatedly has demanded that Global Marketing make a full payment of the $1 million, plus interest and expenses owed to Numico under the Global Marketing Promissory Note.

75.    Global Marketing has failed to respond to Numico's repeated demands for repayment of the Global Market Promissory Note, and no payments have been made by Global Marketing on the Global Marketing Promissory Note.

CHICAGO/#914511.7 10/7/02

76.    Under GAAP applied upon a consistent basis, Enrich's Financial Statements, including the December 1999 Balance Sheet, should not have reflected the $1 million Global Marketing Promissory Note as an asset of Enrich or should have included a reserve for the $1 million Global Marketing Promissory Note.

77.    Enrich's Financial Statements, including the December 1999 Balance Sheet, overstated Enrich's assets and/or understated the reserve for the Global Marketing Promissory Note by $1 million.

78.    Accordingly, Enrich's Financial Statements, including the December 1999 Balance Sheet, were not prepared in conformity with GAAP applied on a consistent basis and/or did not present fairly the results of operations of Enrich and its Subsidiaries, and/or did not present fairly the consolidated financial condition of Enrich and its Subsidiaries, and each such failure breached the representations and warranties contained in Section 3.5 of the Merger Agreement.

## OVERSTATED ASSET FOR ALOE COMMODITIES DEPOSIT FOR FUTURE PRODUCT PURCHASES

79.    Enrich's Financial Statements, including the December 1999 Balance Sheet, reflected an Enrich asset of $300,460 as a deposit for future purchases by Enrich of Aloe Commodities' products.

80.    The Aloe Commodities deposit has not been repaid in full.

81.    Only $54,000 of the deposit has been used for Enrich's purchases of products from Aloe Commodities, leaving a balance of $246,460.

82.    The prices that Aloe Commodities charges for its products are not competitive in the marketplace and, accordingly, Enrich would be required to pay a premium on the purchase of Aloe Commodities' products.

83.     Thus, as of the date of Enrich's Financial Statements were provided to Numico, Enrich knew or should have known that the remaining balance on the deposit for future purchases by Enrich of Aloe Commodities' products had no value and should not have been reflected as an asset of Enrich on Enrich's Financial Statements.

84.     Enrich's Financial Statements, including the December 1999 Balance Sheet, overstated the asset for Aloe Commodities deposit for future product purchases by $246,460.

85.     Accordingly, Enrich's Financial Statements, including the December 1999 Balance Sheet, were not prepared in conformity with GAAP applied on a consistent basis and/or did not present fairly the results of operations of Enrich and its Subsidiaries, and/or did not present fairly the consolidated financial condition of Enrich and its Subsidiaries, and each such failure breached the representations and warranties contained in Section 3.5 of the Merger Agreement.

UNDERSTATED COMMISSION EXPENSES TO JAPANESE DISTRIBUTORS

86.     Enrich's Financial Statements, including the December 1999 Balance Sheet, understated the commission expenses owed to certain Japanese distributors of Enrich's products by $869,725 for two reasons.

87.     First, the Japanese commission expenses for Enrich's OTG program were calculated and accrued on the wrong currency exchange rates.  As a result, the actual commission payments exceeded the accrued commissions for the period July 1999 through December 1999, causing understated commission expense of $755,327.

88.     Second, Enrich used the MLM system, which was the order management system for Enrich's operations.  A manual entry was required to be posted to reconcile the MLM system to the accounting BAAN systems, to, among other things, calculate that Japanese commission expense.  However, the MLM and BAAN systems did not reconcile.  As a result, a manual entry

- 18 -

plug was required to be posted to reconcile the MLM system to the BAAN system. The unreconciled difference between the two systems totaled $114,398 as of December 31, 1999.

89.     Enrich's Financial Statements, including the December 1999 Balance Sheet, understated the commission expenses for Japanese distributors by $869,725 and overstated Enrich's total equity in a like amount.

90.     Accordingly, Enrich's Financial Statements, including the December 1999 Balance Sheet, were not prepared in conformity with GAAP applied on a consistent basis and/or did not present fairly the results of operations of Enrich and its Subsidiaries, and/or did not present fairly the consolidated financial condition of Enrich and its Subsidiaries, and each such failure breached the representations and warranties contained in Section 3.5 of the Merger Agreement.

## OVERSTATED INVESTMENT IN VANSON, INC.

91.     Enrich's Financial Statements, including the December 1999 Balance Sheet, reflected an Enrich asset in an amount of $250,000, representing Enrich's ownership in certain equity in Vanson, Inc.

92.     Upon information and belief, in January, 1996, Enrich purchased a 7.5% limited partnership interest in the predecessor to Vanson, Inc. for $250,000.

93.     Upon information and belief, on April 1, 1997, that limited partnership was converted to a "C" corporation and became Vanson, Inc.

94.     Upon information and belief, as part of that conversion, Enrich exchanged its limited partnership interest for a portion of the outstanding stock of Vanson, Inc.

95.     Enrich's investment in Vanson, Inc. was recorded on Enrich's books as an asset on the cost method.

- 19 -

96.     Upon information and belief, in 1998 and 1999, Vanson, Inc. experienced net operating losses of $1,586,929 and $1,482,819, respectively.

97.     In the Vanson, Inc. Financial Statements Years Ended December 31, 1998 and 1998 and Accountants' Review Report, Vanson Inc.'s auditors, Finnelly, Neil & Company, P.S., stated that certain conditions indicated that Vanson, Inc. may be unable to continue as an ongoing concern.

98.     Under GAAP applied on a consistent basis, Enrich's investment in Vanson, Inc. should not have been recorded as an asset valued at $250,000 on Enrich's Financial Statements, including the December 1999 Balance Sheet.

99.     Enrich's Financial Statements, including the December 1999 Balance Sheet, overstated Enrich's investment in Vanson, Inc. by $250,000.

100.    Accordingly, Enrich's Financial Statements, including the December 1999 Balance Sheet, were not prepared in conformity with GAAP applied on a consistent basis and/or did not present fairly the results of operations of Enrich and its Subsidiaries, and/or did not present fairly the consolidated financial condition of Enrich and its Subsidiaries, and each such failure breached the representations and warranties contained in Section 3.5 of the Merger Agreement.

## CONSOLIDATION OVERSTATEMENT OF TOTAL EQUITY

101.    The consolidation of the equity of Enrich's subsidiaries reflected on Enrich's Financial Statements, including the December 31, 1999 Balance Sheet, improperly overstated Enrich's total equity by $1,300,563 for two reasons.

102.    First, prior to December 31, 1999, 40% of Enrich's Malaysian subsidiary, Enrich Rosowella (M) Sdn Bhd (the "Malaysian Subsidiary") was owned by Aznan Bin Jaya.

- 20 -

103.   Mr. Aznan Bin Jaya's 40% minority interest in the Malaysian Subsidiary had a value of $585,216, based on the local Malaysian annual report and ledgers, but it was not reflected in Enrich's Financial Statements, including the December 1999 Balance Sheet, as required by GAAP.

104.   Therefore, Enrich's Financial Statements, including the December 1999 Balance Sheet, overstated Enrich's ownership interest in the Malaysian Subsidiary by $585,216.

105.   Second, the trial balances of Enrich's subsidiaries' assets and liabilities according to the BAAN system do not reconcile with the consolidation spreadsheets of Enrich's assets and liabilities as set forth in Enrich's Financial Statements, including the December 1999 Balance Sheet.

106.   GAAP applied on a consistent basis requires that the trial balances of Enrich's subsidiaries' assets and liabilities reconcile with the consolidation of Enrich's total equity set forth in Enrich's Financial Statements, including the December 1999 Balance Sheet.

107.   Differences were captured as "Translation Adjustments" totaling $715,347 classified as part of Enrich's equity to reconcile the trial balances of Enrich's subsidiaries with Enrich's consolidation spreadsheets as set forth in Enrich's Financial Statements, including the December 1999 Balance Sheet.

108.   Thus, Enrich's Financial Statements, including the December 1999 Balance Sheet, overstated Enrich's total equity by $715,347.

109.   In sum, Enrich's Financial Statements, including the December 1999 Balance Sheet overstated Enrich's total equity by $1,300,563.

110.   Accordingly, Enrich's Financial Statements, including the December 1999 Balance Sheet, were not prepared in conformity with GAAP applied on a consistent basis and/or

did not present fairly the results of operations of Enrich and its Subsidiaries, and/or did not present fairly the consolidated financial condition of Enrich and its Subsidiaries, and each such failure breached the representations and warranties contained in Section 3.5 of the Merger Agreement.

## UNRECONCILED SUBLEDGER SYSTEMS

111.   Enrich's Financial Statements, including the December 1999 Balance Sheet, overstated Enrich's Tangible Fixed Assets for Japan by $120,576.

112.   Accordingly, Enrich's Financial Statements, including the December 1999 Balance Sheet, were not prepared in conformity with GAAP applied on a consistent basis and/or did not present fairly the results of operations of Enrich and its Subsidiaries, and/or did not present fairly the consolidated financial condition of Enrich and its Subsidiaries, and each such failure breached the representations and warranties contained in Section 3.5 of the Merger Agreement.

## UNRECORDED LIABILITIES

113.   Enrich incurred certain liabilities in 1996 through 1999 totaling $245,865 that were paid by Enrich in 2000.

114.   Such liabilities were not reflected on Enrich's Financial Statements, including the December 1999 Balance Sheet.

115.   Under GAAP applied on a consistent basis, Enrich's Financial Statements, including the December 1999 Balance Sheet, should have included those liabilities totaling $245,865.

116.   Enrich's Financial Statement, including the December 1999 Balance Sheet, understated the amount of Enrich's liabilities by $245,865.

117.    In addition, profit markups of almost 40% were charged for the intercompany deliveries of products by Enrich to its Japanese subsidiary.  The profit markups on such products totaled at least $1,888,040 as of December 31, 1999.  The profit markups were not supported by an intercompany pricing study, and Enrich did not reflect a liability for such profit markups on Enrich's Financial Statements, including the December 1999 Balance Sheet, as required by GAAP applied on a consistent basis.  As a result, Enrich's Financial Statements, including the December 1999 Balance Sheet, understated the amount of Enrich's liabilities by at least $1,888,040.

118.    Enrich charged similar profit markups on intercompany deliveries of products by Enrich to its other foreign subsidiaries that were not supported by an intercompany pricing study. Enrich did not reflect a liability for such profits markups on Enrich's Financial Statements, including the December 1999 Balance Sheet, as required by GAAP applied on a consistent basis. As a result, Enrich's Financial Statements, including the December 1999 Balance Sheet, understated the amount of Enrich's liabilities with respect to such profit markups.

119.    Accordingly, Enrich's Financial Statements, including the December 1999 Balance Sheet, were not prepared in conformity with GAAP applied on a consistent basis and/or did not present fairly the results of operations of Enrich and its Subsidiaries, and/or did not present fairly the consolidated financial condition of Enrich and its Subsidiaries, and each such failure breached the representations and warranties contained in Section 3.5 of the Merger Agreement.

- 23 -

## OVERSTATED DEFERRED TAX ASSET

120.   Enrich's Financial Statements, including the December 1999 Balance Sheet, reflected a Deferred Tax Asset in the amount of $7,550,346.

121.   However, the Deferred Tax Asset was overstated by $3,967,433, calculated as follows:

|  | Gross Amount | Net Amount (based on 38% tax rate) |
|---|---|---|
| Accrued Long-Term Fees for July 1997 and February 1998 | $3,767,959 | $1,431,824 |
| Management fees/Malaysia 1999 | 2,286,870 | 869,010 |
| Management fees/Japan 1999 | 993,848 | 377,662 |
| Interest allocations/Malaysia and Japan | 1,966,370 | 747,220 |
| Allocated expenses paid by US to Japan | 1,425,045 | 541,717 |
| TOTAL | $10,440,092 | $3,967,433 |

122.   Enrich's Financial Statements, including the December 1999 Balance Sheet, overstated the Enrich's Deferred Tax Asset by $3,967,433.

123.   Accordingly, Enrich's Financial Statements, including the December 1999 Balance Sheet, were not prepared in conformity with GAAP applied on a consistent basis and/or did not present fairly the results of operations of Enrich and its Subsidiaries, and/or did not present fairly the consolidated financial condition of Enrich and its Subsidiaries, and each such failure breached the representations and warranties contained in Section 3.5 of the Merger Agreement.

## OVERSTATEMENT OF MALAYSIAN TAX RECEIVABLE

124.   Enrich's Financial Statements, including the December 1999 Balance Sheet, reflected a prepaid tax in the amount of $193,740 for Enrich's Malaysia Subsidiary.

- 24 -

125.   The prepaid tax was posted by Enrich as a manual-entry plug to Enrich's consolidated balance sheet.

126.   The Malaysia Subsidiary did not account for this prepaid tax because the Malaysian Subsidiary was profitable and paid taxes over the period of April 1999 through March 2000.

127.   Enrich's Financial Statements, including the December 1999 Balance Sheet, overstated the Malaysian Subsidiary's tax receivable by $193,740.

128.   Accordingly, Enrich's Financial Statements, including the December 1999 Balance Sheet, were not prepared in conformity with GAAP applied on a consistent basis and/or did not present fairly the results of operations of Enrich and its Subsidiaries, and/or did not present fairly the consolidated financial condition of Enrich and its Subsidiaries, and each such failure breached the representations and warranties contained in Section 3.5 of the Merger Agreement.

## UNDERSTATED MALAYSIA TAX LIABILITY PAYABLE

129.   The profits filed for tax purposes for Enrich's Malaysian Subsidiary in Malaysia for the period of April 1999 through March 2000 was RM 9,730,246 (U.S. $2,560,591).

130.   Taxes paid by Enrich's Malaysian Subsidiary in Malaysia over this period was RM 2,724,468 (U.S. $716,965).

131.   Enrich's Malaysian Subsidiary's profits before taxes as of December 1999 according to the Malaysian Subsidiary's local books were $753,259.

132.   Based on a 28% tax rate, the tax payable should have been U.S. $207,184.

133.   Enrich failed to account for this tax liability of $207,184 at a consolidated level as of December 1999 in Enrich's Financial Statements, including the December 1999 Balance Sheet.

CHICAGO/#914511.7 10/7/02

134.   Enrich's Financial Statements, including the December 1999 Balance Sheet, understated the tax payable for Enrich's Malaysia Subsidiary by $207,184.

135.   Accordingly, Enrich's Financial Statements, including the December 1999 Balance Sheet, were not prepared in conformity with GAAP applied on a consistent basis and/or did not present fairly the results of operations of Enrich and its Subsidiaries, and/or did not present fairly the consolidated financial condition of Enrich and its Subsidiaries, and each such failure breached the representations and warranties contained in Section 3.5 of the Merger Agreement.

### UNRECONCILED JAPANESE TAX RECEIVABLE

136.   Enrich's Financial Statements, including the December 1999 Balance Sheet, reflected a prepaid tax of $572,180 for Enrich's Japanese subsidiary.

137.   This prepaid tax receivable was not reflected in Enrich's Japanese subsidiary's books because the Japanese subsidiary never prepaid any Japanese income tax nor did it ever have current tax receivables.

138.   Enrich's Financial Statements, including the December 1999 Balance Sheet, overstated the Japanese tax receivable by $572,180.

139.   Accordingly, Enrich's Financial Statements, including the December 1999 Balance Sheet, were not prepared in conformity with GAAP applied on a consistent basis and/or did not present fairly the results of operations of Enrich and its Subsidiaries, and/or did not present fairly the consolidated financial condition of Enrich and its Subsidiaries, and each such failure breached the representations and warranties contained in Section 3.5 of the Merger Agreement.

CHICAGO/#914511.7 10/7/02

140.   As a result of the aforementioned breaches of the representations and warranties set forth in Section 3.5 of the Merger Agreement, Numico has sustained Losses in excess of $12 million.

141.   Numico has demanded that the Former Enrich Shareholders indemnify Numico for the Losses it has sustained in excess of the $1 Million Threshold as a result of the aforementioned breaches of the representations and warranties set forth in Section 3.5 of the Merger Agreement.

142.   The Former Enrich Shareholders have breached the Indemnification Agreement by refusing and failing to indemnify Numico for the Losses it has sustained in excess of the $1 Million Threshold as a result of the aforementioned breaches of the representations and warranties set forth in Section 3.5 of the Merger Agreement.

143.   As a direct and proximate result of the Former Enrich Shareholders' breach, Numico has been damaged in an amount in excess of $75,000.

## COUNT II

### CLAIM FOR INDEMNIFICATION RELATING TO BREACH OF REPRESENTATIONS AND WARRANTIES RELATING TO TAXES AND TAX RETURNS AGAINST THE FORMER ENRICH SHAREHOLDERS

144.   Numico repeats, realleges and incorporates by reference, as if fully set forth herein, the allegations set forth in Paragraphs 1-56, above.

### UNCLAIMED PROPERTY ESCHEAT

145.   Prior to December 1999, Enrich issued certain checks that were payable to Enrich's distributors for commissions for the period of August 1999 through December 1999.

146.   Prior to December 1999, certain of those checks to the distributors remained outstanding and un-presented.

147.    Following the Closing, the State of Utah conducted a review of Enrich's records for unreported and unclaimed property on behalf of itself and approximately 36 other states.

148.    The State of Utah claimed that there were outstanding and un-presented Enrich checks that were payable to distributors for commissions for the period of August 1999 through December 1999.

149.    On or about August 21, 2001, Enrich was notified by the State of Utah that $609,975 in outstanding and un-presented checks should have been reported and paid by Enrich as unclaimed property escheat to the State of Utah.

150.    The State of Utah also asserted that accrued interest, penalties and audit fees related thereto totaled an additional $294,700.

151.    The State of Utah offered to settle the charges and assessments for the unclaimed property escheat for $408,700.

152.    The amounts relating to the charges and assessments by the State of Utah for the unclaimed property escheat constituted a "Tax" as defined in the Merger Agreement.

153.    In Part 3.8(a)(ii) of the Disclosure Schedule to the Merger Agreement relating to the representations and warranties of Enrich regarding Enrich's and its Subsidiaries' Taxes and Tax Returns, Enrich listed the potential audit by the State of Utah and listed the "Unclaimed Property" related thereto as a "Type of Tax."

154.    As a result, Enrich admitted that the charges and assessments by the State of Utah relating to the unclaimed property escheat was a "Tax" as defined in the Merger Agreement.

155.    Prior to the Closing, Enrich failed to pay the escheat tax to the State of Utah.

156.    Enrich did not fully and adequately reserve in Enrich's financial statements for the escheat tax to be paid to the State of Utah, as required by GAAP.

157.   Accordingly, Enrich breached the representations and warranties contained in Section 3.8 of the Merger Agreement.

**CANADIAN TAX AUDIT**

158.   Prior to December 31, 1999, Enrich incurred certain Canadian taxes and interest expenses for tax periods prior to Closing.

159.   However, as of December 31, 1999, Enrich failed to pay those Canadian taxes and interest expenses.

160.   Enrich did not fully and adequately reserve in Enrich's financial statements for Canadian taxes and interest expenses, as required by GAAP.

161.   The Canadian taxing authorities have asserted a claim against Enrich for unpaid taxes and interest expenses for tax periods prior to the Closing.

162.   After the Closing, Numico was required to enter into an agreement with the Canadian taxing authorities whereby Numico paid at least $1,751,366 for Enrich's unpaid Canadian taxes and interest that were incurred prior to the Closing.

163.   Accordingly, Enrich breached the representations and warranties contained in Section 3.8 of the Merger Agreement.

164.   As a result of the aforementioned breaches of the representations and warranties set forth in Section 3.8 of the Merger Agreement, Numico has sustained Losses in excess of $2.1 million.

165.   Numico has demanded that the Former Enrich Shareholders indemnify Numico for the Losses it has sustained as a result of the aforementioned breaches of the representations and warranties set forth in Section 3.8 of the Merger Agreement.

166.   The Former Enrich Shareholders have breached the Indemnification Agreement by refusing and failing to indemnify Numico for the Losses it has sustained as a result of the

aforementioned breaches of the representations and warranties set forth in Section 3.8 of the Merger Agreement.

167.    As a direct and proximate result of the Former Enrich Shareholders' breach, Numico has been damaged in an amount in excess of $75,000.

## COUNT III

### CLAIM FOR INDEMNIFICATION RELATING TO THE ENRICH DISSENTING SHAREHOLDERS MATTERS AGAINST THE FORMER ENRICH SHAREHOLDERS

168.    Numico repeats, realleges and incorporates by reference, as if fully set forth herein, the allegations set forth in Paragraphs 1-56 above.

169.    Numico has sustained Losses totaling $12,227 resulting from, arising out of, relating to, or caused by the Enrich Dissenting Shareholders Matters.

170.    Numico has demanded that the Former Enrich Shareholders indemnify Numico for the Losses it has sustained related to the Enrich Dissenting Shareholders Matters pursuant to Section 4(b)(ii)(A) of the Indemnification Agreement.

171.    The Former Enrich Shareholders have breached the Indemnification Agreement by refusing and failing to indemnify Numico for the Losses it sustained relating to the Enrich Dissenting Shareholders Matters.

172.    As a direct and proximate result of the Former Enrich Shareholders' breach, Numico has been damaged in the amount of $12,227.

## COUNT IV

### CLAIM FOR INDEMNIFICATION RELATING TO BULAVCHENKO MATTERS AGAINST THE FORMER ENRICH SHAREHOLDERS

173.    Numico repeats, realleges and incorporates by reference, as if fully set forth herein, the allegations set forth in Paragraphs 1-56, above.

174.   Numico has sustained Losses totaling $311,843 resulting from, arising out of, relating to, or caused by the Bulavchenko Matters.

175.   Numico has demanded that the Former Enrich Shareholders indemnify Numico for the Losses it has sustained as a result of the Bulavchenko Matters.

176.   The Former Enrich Shareholders have breached the Indemnification Agreement by refusing and failing to indemnify Numico for the Losses it sustained as a result of the Bulavchenko Matters.

177.   As a direct and proximate result of the Former Enrich Shareholders' breach, Numico has been damaged in an amount in excess of $75,000.

<u>COUNT V</u>

<u>BREACH OF AGREEMENT OF GUARANTY AGAINST GLENN J. BOSCHETTO</u>

178.   Numico repeats, realleges and incorporates by reference, as if fully set forth herein, the allegations set forth in Paragraphs 1-56, above.

179.   In connection with Numico's acquisition of Enrich and Windriver's execution of the Indemnification Agreement, and in order to induce Numico to enter into the Merger Agreement and consummate the transactions contemplated therein, on or about February 29, 2000, Nutricia Utah entered into Agreement of Guaranty with Glenn J. Boschetto (the "Boschetto Guaranty").

180.   Section 2 of the Boschetto Guaranty provides that Glenn J. Boschetto "absolutely, unconditionally and irrevocably guarantees to [Numico] the collection of all amounts which shall become due and payable by [Windriver] under the Indemnification Agreement."

181.   Section 4 of the Boschetto Guaranty provides that: "This Guaranty shall remain in full force and effect and nothing shall discharge or satisfy the liability of [Glenn J. Boschetto]

hereunder until the termination of [Windriver's] obligation under the Indemnification

Agreement."

182.   Section 5 of the Boschetto Guaranty provides that:

This is a present and continuing Guaranty of collection and not of performance. [Glenn J. Boschetto] agrees that the liability of [Glenn J. Boschetto] hereunder may be enforced by [Numico] without the necessity at any time of resorting to, or exhausting or realizing upon, any security or collateral. [Glenn J. Boschetto] further agrees that nothing contained hereunder or otherwise shall prevent [Numico] from pursuing against [Windriver] all rights and remedies available to it at law and/or in equity or under the Indemnification Agreement prior to or concurrently with the exercise of [Numico's] rights hereunder, and the exercise by [Numico] of any of its rights or the completion of any of its remedies against [Windriver] shall not constitute a discharge of [Glenn J. Boschetto's] obligations hereunder except to the extent [Numico] fully and unconditionally realizes payment by such action or proceeding.

183.   Section 6 of the Boschetto Guaranty provides that:

[Numico] shall have the right to seek recourse against [Glenn J. Boschetto] to the fullest extent provided for herein against [Windriver] to the fullest extent provided for in the Indemnification Agreement. Except as provided in this Guaranty, no election to proceed in one form of action or proceeding, or against any party, or on any obligation, shall constitute a waiver of [Numico's] right to proceed in any other form of action or proceeding or against other parties unless [Numico] has expressly waived such right in writing. Specifically, but without limiting the generality of the foregoing, no action or proceeding by [Numico] against [Windriver] or any other party shall serve to diminish the liability of [Glenn J. Boschetto] except to the extent [Numico] fully and unconditionally realizes payment by such action or proceeding, notwithstanding the effect of any such action or proceeding upon [Glenn J. Boschetto's] rights of subrogation or contribution against [Windriver] or any other party.

184.   Section 7 of the Boschetto Guaranty provides that "[Glenn J. Boschetto] agrees to

pay all reasonable expenses incurred by [Numico] in enforcement of its rights under this

Guaranty should enforcement be successful, including, without limitation, court costs, collection charges and reasonable attorneys' fees and disbursements."

185.   Amounts in excess of $75,000 are due and payable by Windriver to Numico under the Indemnification Agreement.

186.   Numico has performed all of its obligations under the Boschetto Guaranty.

187.   All conditions precedent to Glenn J. Boschetto's performance of his obligations under the Boschetto Guaranty have been performed or have occurred.

188.   Numico has demanded that Glenn J. Boschetto pay Numico all the amounts that are due and payable by Windriver to Numico under the Indemnification Agreement.

189.   Glenn J. Boschetto breached the Boschetto Guaranty by refusing and failing to pay Numico all the amounts that are due and payable by Windriver to Numico under the Indemnification Agreement.

190.   As a direct and proximate result of Glenn J. Boschetto's breach of the Boschetto Guaranty, Numico has been damaged in an amount in excess of $75,000.

## COUNT VI

### BREACH OF AGREEMENT OF GUARANTY AGAINST KENNETH BRAILSFORD

191.   Numico repeats, realleges and incorporates by reference, as if fully set forth herein, the allegations set forth in Paragraphs 1-56, above.

192.   In connection with Numico's acquisition of Enrich and KEB Enterprise's execution of the Indemnification Agreement, and in order to induce Numico to enter into the Merger Agreement and consummate the transactions contemplated therein, on or about February 29, 2000, Nutricia Utah entered into Agreement of Guaranty with Kenneth Brailsford (the "Brailsford Guaranty").

193.   Section 2 of the Brailsford Guaranty provides that Kenneth Brailsford "absolutely, unconditionally and irrevocably guarantees to [Numico] the collection of all amounts which shall become due and payable by [KEB Enterprises] under the Indemnification Agreement."

194.   Section 4 of the Brailsford Guaranty provides that: "This Guaranty shall remain in full force and effect and nothing shall discharge or satisfy the liability of [Kenneth Brailsford] hereunder until the termination of [KEB Enterprises'] obligation under the Indemnification Agreement."

195.   Section 5 of the Brailsford Guaranty provides that:

This is a present and continuing Guaranty of collection and not of performance.   [Kenneth Brailsford] agrees that the liability of [Kenneth Brailsford] hereunder may be enforced by [Numico] without the necessity at any time of resorting to, or exhausting or realizing upon, any security or collateral.   [Kenneth Brailsford] further agrees that nothing contained hereunder or otherwise shall prevent [Numico] from pursuing against [KEB Enterprises] all rights and remedies available to it at law and/or in equity or under the Indemnification Agreement prior to or concurrently with the exercise of [Numico's] rights hereunder, and the exercise by [Numico] of any of its rights or the completion of any of its remedies against [KEB Enterprises] shall not constitute a discharge of [Kenneth Brailsford's] obligations hereunder except to the extent [Numico] fully and unconditionally realizes payment by such action or proceeding.

196.   Section 6 of the Brailsford Guaranty provides that:

[Numico] shall have the right to seek recourse against [Kenneth Brailsford] to the fullest extent provided for herein against [KEB Enterprises] to the fullest extent provided for in the Indemnification Agreement.   Except as provided in this Guaranty, no election to proceed in one form of action or proceeding, or against any party, or on any obligation, shall constitute a waiver of [Numico's] right to proceed in any other form of action or proceeding or against other parties unless [Numico] has expressly waived such right in writing.   Specifically, but without limiting the generality of the foregoing, no action or proceeding by [Numico] against [KEB Enterprises] or any other party shall serve to

- 34 -

diminish the liability of [Kenneth Brailsford] except to the extent [Numico] fully and unconditionally realizes payment by such action or proceeding, notwithstanding the effect of any such action or proceeding upon [Kenneth Brailsford's] rights of subrogation or contribution against [KEB Enterprises] or any other party.

197.    Section 7 of the Brailsford Guaranty provides that "[Kenneth Brailsford] agrees to pay all reasonable expenses incurred by [Numico] in enforcement of its rights under this Guaranty should enforcement be successful, including, without limitation, court costs, collection charges and reasonable attorneys' fees and disbursements."

198.    Amounts in excess of $75,000 are due and payable by KEB Enterprises to Numico under the Indemnification Agreement.

199.    Numico has performed all of its obligations under the Brailsford Guaranty.

200.    All conditions precedent to Kenneth Brailsford's performance of his obligations under the Brailsford Guaranty have been performed or have occurred.

201.    Numico has demanded that Kenneth Brailsford pay Numico all the amounts that are due and payable by KEB Enterprises to Numico under the Indemnification Agreement.

202.    Kenneth Brailsford breached the Brailsford Guaranty by refusing and failing to pay Numico all the amounts that are due and payable by KEB Enterprises to Numico under the Indemnification Agreement.

203.    As a direct and proximate result of Kenneth Brailsford's breach of the Brailsford Guaranty, Numico has been damaged in an amount in excess of $75,000.

## COUNT VII

### BREACH OF AGREEMENT OF GUARANTY AGAINST KURT B. LARSEN

204.    Numico repeats, realleges and incorporates by reference, as if fully set forth herein, the allegations set forth in Paragraphs 1-56, above.

205.    In connection with Numico's acquisition of Enrich and NSI's execution of the Indemnification Agreement, and in order to induce Numico to enter into the Merger Agreement and consummate the transactions contemplated therein, on or about February 29, 2000, Nutricia Utah entered into Agreement of Guaranty with Kurt B. Larsen (the "Larsen/NSI Guaranty").

206.    Section 2 of the Larsen/NSI Guaranty provides that Kurt B. Larsen "absolutely, unconditionally and irrevocably guarantees to [Numico] the collection of all amounts which shall become due and payable by [NSI] under the Indemnification Agreement."

207.    Section 4 of the Larsen/NSI Guaranty provides that: "This Guaranty shall remain in full force and effect and nothing shall discharge or satisfy the liability of [Kurt B. Larsen] hereunder until the termination of [NSI's] obligation under the Indemnification Agreement."

208.    Section 5 of the Larsen/NSI Guaranty provides that:

"This is a present and continuing Guaranty of collection and not of performance.    [Kurt B. Larsen] agrees that the liability of [Kurt B. Larsen] hereunder may be enforced by [Numico] without the necessity at any time of resorting to, or exhausting or realizing upon, any security or collateral.  [Kurt B. Larsen] further agrees that nothing contained hereunder or otherwise shall prevent [Numico] from pursuing against [NSI] all rights and remedies available to it at law and/or in equity or under the Indemnification Agreement prior to or concurrently with the exercise of [Numico's] rights hereunder, and the exercise by [Numico] of any of its rights or the completion of any of its remedies against [NSI] shall not constitute a discharge of [Kurt B. Larsen's] obligations hereunder except to the extent [Numico] fully and unconditionally realizes payment by such action or proceeding.

209.    Section 6 of the Larsen/NSI Guaranty provides that:

[Numico] shall have the right to seek recourse against [Kurt B. Larsen] to the fullest extent provided for herein against [NSI] to the fullest extent provided for in the Indemnification Agreement.  Except as provided in this Guaranty, no election to proceed in one form of action or proceeding, or against any party, or on any obligation, shall constitute a waiver of [Numico's] right to proceed in any other form of action or proceeding or against other parties unless [Numico] has expressly waived such right in

writing.  Specifically, but without limiting the generality of the foregoing, no action or proceeding by [Numico] against [NSI] or any other party shall serve to diminish the liability of [Kurt B. Larsen] except to the extent [Numico] fully and unconditionally realizes payment by such action or proceeding, notwithstanding the effect of any such action or proceeding upon [Kurt B. Larsen's] rights of subrogation or contribution against [NSI] or any other party.

210.    Section 7 of the Larsen/NSI Guaranty provides that "[Kurt B. Larsen] agrees to pay all reasonable expenses incurred by [Numico] in enforcement of its rights under this Guaranty should enforcement be successful, including, without limitation, court costs, collection charges and reasonable attorneys' fees and disbursements."

211.    Amounts in excess of $75,000 are due and payable by NSI to Numico under the Indemnification Agreement.

212.    Numico has performed all of its obligations under the Larsen/NSI Guaranty.

213.    All conditions precedent to Kurt B. Larsen's performance of his obligations under the Larsen/NSI Guaranty have been performed or have occurred.

214.    Numico has demanded that Kurt B. Larsen pay Numico all the amounts that are due and payable by NSI to Numico under the Indemnification Agreement.

215.    Kurt B. Larsen breached the Larsen/NSI Guaranty by refusing and failing to pay Numico all the amounts that are due and payable by NSI to Numico under the Indemnification Agreement.

216.    As a direct and proximate result of Kurt B. Larsen's breach of the Larsen/NSI Guaranty, Numico has been damaged in an amount in excess of $75,000.

**COUNT VIII**

**BREACH OF AGREEMENT OF GUARANTY AGAINST KURT B. LARSEN**

217.   Numico repeats, realleges and incorporates by reference, as if fully set forth herein, the allegations set forth in Paragraphs 1-56, above.

218.   In connection with Numico's acquisition of Enrich and G$^3$ Holding's execution of the Indemnification Agreement, and in order to induce Numico to enter into the Merger Agreement and consummate the transactions contemplated therein, on or about February 29, 2000, Nutricia Utah entered into Agreement of Guaranty with Kurt B. Larsen (the "Larsen/G$^3$ Holding Guaranty").

219.   Section 2 of the Larsen/G$^3$ Holding Guaranty provides that Kurt B. Larsen "absolutely, unconditionally and irrevocably guarantees to [Numico] the collection of all amounts which shall become due and payable by [G$^3$ Holding] under the Indemnification Agreement."

220.   Section 4 of the Larsen/G$^3$ Holding Guaranty provides that:   "This Guaranty shall remain in full force and effect and nothing shall discharge or satisfy the liability of [Kurt B. Larsen] hereunder until the termination of [G$^3$ Holding's] obligation under the Indemnification Agreement."

221.   Section 5 of the Larsen/G$^3$ Holding Guaranty provides that:

> This is a present and continuing Guaranty of collection and not of performance.   [Kurt B. Larsen] agrees that the liability of [Kurt B. Larsen] hereunder may be enforced by [Numico] without the necessity at any time of resorting to, or exhausting or realizing upon, any security or collateral.   [Kurt B. Larsen] further agrees that nothing contained hereunder or otherwise shall prevent [Numico] from pursuing against [G$^3$ Holding] all rights and remedies available to it at law and/or in equity or under the Indemnification Agreement prior to or concurrently with the exercise of [Numico's] rights hereunder, and the exercise by [Numico] of any of its rights or the completion of any of its

- 38 -

remedies against [G³ Holding] shall not constitute a discharge of [Kurt B. Larsen's] obligations hereunder except to the extent [Numico] fully and unconditionally realizes payment by such action or proceeding.

222.    Section 6 of the Larsen/G³ Holding Guaranty provides that:

[Numico] shall have the right to seek recourse against [Kurt B. Larsen] to the fullest extent provided for herein against [G³ Holding] to the fullest extent provided for in the Indemnification Agreement.  Except as provided in this Guaranty, no election to proceed in one form of action or proceeding, or against any party, or on any obligation, shall constitute a waiver of [Numico's] right to proceed in any other form of action or proceeding or against other parties unless [Numico] has expressly waived such right in writing.  Specifically, but without limiting the generality of the foregoing, no action or proceeding by [Numico] against [G³ Holding] or any other party shall serve to diminish the liability of [Kurt B. Larsen] except to the extent [Numico] fully and unconditionally realizes payment by such action or proceeding, notwithstanding the effect of any such action or proceeding upon [Kurt B. Larsen's] rights of subrogation or contribution against [G³ Holding] or any other party.

223.    Section 7 of the Larsen/G³ Holding Guaranty provides that "[Kurt B. Larsen] agrees to pay all reasonable expenses incurred by [Numico] in enforcement of its rights under this Guaranty should enforcement be successful, including, without limitation, court costs, collection charges and reasonable attorneys' fees and disbursements."

224.    Amounts in excess of $75,000 are due and payable by G³ Holding to Numico under the Indemnification Agreement.

225.    Numico has performed all of its obligations under the Larsen/G³ Holding Guaranty.

226.    All conditions precedent to Kurt B. Larsen's performance of his obligations under the Larsen/G³ Holding Guaranty have been performed or have occurred.

227.    Numico has demanded that Kurt B. Larsen pay Numico all the amounts that are due and payable by G³ Holding to Numico under the Indemnification Agreement.

228.    Kurt B. Larsen breached the Larsen/G³ Holding Guaranty by refusing and failing to pay Numico all the amounts that are due and payable by G³ Holding to Numico under the Indemnification Agreement.

229.    As a direct and proximate result of Kurt B. Larsen's breach of the Larsen/G³ Holding Guaranty, Numico has been damaged in an amount in excess of $75,000.

WHEREFORE, Numico respectfully requests:

(a)    That Defendants, jointly and severally, be ordered to pay damages in excess of $75,000 in an amount to be proven at trial;

(b)    That Defendants, jointly and severally, be ordered to pay for pre-judgment interest and post-judgment interest;

(c)    That Defendants, jointly and severally, be ordered to pay for Numico's costs, attorneys' fees and other expenses incurred in enforcing the Indemnification Agreement, the Boschetto Guaranty, the Brailsford Guaranty, the Larsen/NSI Guaranty and the Larsen/G³ Holding Guaranty, and in bringing this litigation; and

(d)    Such other and further relief as this Court may deem proper.

### PLAINTIFFS DEMAND TRIAL BY JURY

OF COUNSEL:

Karen P. Layng
Bruce A. Radke
VEDDER, PRICE, KAUFMAN & KAMMHOLZ
222 North LaSalle Street, Suite 2600
Chicago, IL 60601-1003
Telephone: 312/609-7500
Facsimile: 312/609-5005

Dated: October 11, 2002

Kevin G. Abrams (No. 2375)
Thad J. Bracegirdle (No. 3691)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square, P.O. Box 551
Wilmington, DE 19899
Telephone: 302/651-7700
Facsimile: 302/651-7701